

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 16, 2025

**BY ECF**
The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007

**BY EMAIL and ECF**
The Honorable Gary Stein
United States Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007

>    Re:    *United States v. David Maldonado*, 25 Cr. 564 (JSR)

Dear Judge Rakoff and Judge Stein:

The Government respectfully submits this letter in advance of the initial appearance of David Maldonado (the "defendant"). The defendant was arrested after a grand jury sitting in the Southern District of New York returned a two-count indictment charging him with possessing a machinegun that he used to discharge at least twelve shots on a public street in the Bronx on or about November 14, 2025, after having sustained several felony convictions, including prior firearms convictions.

For these reasons and as detailed below, there is no condition or combination of conditions that will reasonably assure the appearance of the defendant as required and the safety of others and the community. *See* 18 U.S.C. §§ 3142(e)(1).

## BACKGROUND

On December 10, 2025, an indictment was returned by a federal grand jury sitting in the Southern District of New York (the "Indictment"), charging David Maldonado with possession of ammunition after a felony conviction, in violation of Title 18, United States Code, Section 922(g)(1), and possession of a machinegun, in violation of Title 18, United States Code, Section 922(o).

### A.    The November 14, 2025 Shooting

The charges in this case stem from a shooting that occurred in the vicinity of East 170th Street and Third Avenue in the Bronx, New York at approximately 4:00 p.m. on or about November 14, 2025.  That afternoon, a team of detectives from the New York City Police Department's ("NYPD") Bronx Narcotics Squad were conducting an operation near East 170th Street and Third Avenue.  As is standard practice during these types of narcotics operations, some of the officers were in plain clothes and on foot while others were nearby in an unmarked vehicle.  As the operation was unfolding, multiple officers heard several loud gunshots in very rapid succession that sounded, according to multiple officers trained in the operation of firearms, like automatic weapon fire.[1]  The officers immediately looked in the direction of the sound and saw a man—later identified as the defendant—wearing a black jacket, black pants, a baseball cap, and red sneakers, who appeared to be putting a heavy object inside of his jacket.

At least two officers also reported seeing smoke emanating from the vicinity of where the man was standing.  Believing that the sound they heard immediately prior to seeing the defendant was the sound of a firearm being discharged, the officers who were on foot began to walk toward the defendant.  At the same time, officers radioed the officers who were in the nearby vehicle and provided a description of the defendant and his clothing.  The officers on foot and the officers in the vehicle all then followed the defendant to the front of a building located at 1460 Washington Avenue, where the defendant was apprehended.  The officers frisked the defendant and found a nine-millimeter firearm inside of his jacket pocket—in the same location officers reported seeing him place an object moments earlier.  In addition to the firearm and an empty magazine (consistent with the firearm having been recently fired), the defendant had in his possession an identification card that confirmed his identity as David Maldonado.  Photographs of the defendant after his arrest while still wearing the clothes that matched the description of the man officers saw immediately upon hearing the gunshots are below:

 

---

[1] A fully automatic weapon discharges multiple rounds of ammunition with the single pull of the trigger, without manual reloading, which leads to the discharge of a volume of fire in rapid succession that would otherwise not be possible.  *See* https://www.youtube.com/watch?v=Tmyk9qm3wkQ.

Once the defendant was in custody, officers returned to the area where they had first seen the defendant, and where they had heard the gunshots. There, officers recovered twelve nine-millimeter cartridge cases, which is consistent with twelve bullets having been fired. Officers also observed a vehicle that appeared to have been hit by multiple gunshots. Photographs of the vehicle are below:

 

### B.    The Defendant's Possession of a Machinegun

The firearm that was seized by the defendant was sent by the NYPD to the Bureau of Alcohol, Tobacco, Firearms, and Explosives's ("ATF") Firearms and Ammunition Technology Division ("FATD"), which houses the Government's technical experts on classifying firearms and ammunition under federal statutes and regulations. FATD uses leading-edge technologies to analyze the origins of crime guns and identify emerging trends in criminal activity. The FATD's Firearms Enforcement Officers are firearm experts trained in all aspects of firearm operation and identification.

The FATD analyzed the firearm and magazine that were seized from the defendant and concluded that the firearm qualifies as a machinegun pursuant to the Gun Control Act, Title 18, United States Code, Section 921(a)(24) and Title 26, the National Firearms Act. The ATF has concluded that the defendant is not registered with ATF to possess any Title 26 firearms.

A photograph of the firearm and magazine is below:



The defendant's firearm is not an ordinary handgun. The ATF FATD determined that it is an unserialized Polymer 80, model PF940C, 9x19mm caliber firearm, also known as a "ghost gun." The firearm is a semi-automatic handgun with an illegal machinegun conversion device installed, which converts his firearm into a fully automatic machinegun capable of shooting more than one shot with a single pull of the trigger. In other words, the defendant possessed a firearm that had been transformed from a regular handgun to a virtually untraceable fully automatic machinegun. A photograph specifically depicting the Glock-style machinegun conversion device (colloquially referred to as a "Glock switch") that was installed on the pistol slide is below:



In addition to analyzing the firearm, the ATF has also assessed the twelve cartridge cases that were recovered from the area where officers first saw the defendant standing after they heard the gunshots.  The ATF special agent who has analyzed the cartridge cases has concluded that all twelve were manufactured outside the State of New York.

### C.        The Defendant's Lengthy and Serious Criminal History

This offense is far from the defendant's first brush with the law.  Indeed, the defendant has been convicted of several prior felony offenses, including federal felony gun and drug offenses in the Southern District of New York.

The defendant's first felony conviction was for Possession of a Narcotic Drug in the Fourth Degree in December of 1998.  He was sentenced to six months' imprisonment.  The defendant was again convicted of a felony offense in December 2003 after he pleaded guilty to Criminal Possession of a Weapon in the Third Degree and Attempted Criminal Sale of a Controlled Substance in the Third Degree, for which the defendant was ultimately sentenced to three-to-six years' imprisonment and served just over three years in prison.  The defendant was released onto parole for those offenses in April 2007 and his parole was revoked because of a violation in June 2009.  The defendant's parole violation related to his conviction for yet another felony offense.  In May of 2009, the defendant was conceited of Attempted Criminal Possession of a Controlled Substance in the Fifth Degree and was sentenced to two years' imprisonment.

But the defendant's state convictions do not tell the full story.  The defendant has also been convicted of very serious federal felony offenses.  In March of 2007, the defendant was convicted of four federal felony offenses, including conspiracy to distribute cocaine and marijuana, maintaining a stash house, possession of a firearm in relation to narcotics offenses, and Hobbs Act robbery.  *See United States v. David Maldonado*, 04 Cr. 616 (LAK).  The defendant has also been convicted of resisting arrest, criminal mischief, and petit larceny.

The defendant's lengthy and serious criminal history has now culminated in this federal charge related to a shooting on a public New York City street.

### ARGUMENT

### I.        Applicable Law

Under the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, the Court may order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  18 U.S.C. § 3142(e).  A finding of risk of flight must be supported by a preponderance of the evidence.  *See, e.g.*, *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985).  A finding of dangerousness must be supported by clear and convincing evidence.  *See, e.g.*, *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Patriarca*, 948 F.2d at 792; *Chimurenga*, 760 F.2d at 405.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the person;

(3) the history and characteristics of the defendant, including the person's "character, . . . past conduct"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." *See* 18 U.S.C. § 3142(g). The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

Evidentiary rules do not apply at detention hearings, and the Government is entitled to present evidence by way of proffer, among other means. *See* 18 U.S.C. § 3142(f)(2); *see also LaFontaine*, 210 F.3d at 130-31 (concluding that the Government is entitled to proceed by proffer in detention hearings).

Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

## II.        Discussion

For the reasons set forth below, the defendant poses a significant danger to the community as well as a serious risk of nonappearance. This is especially true given the nature of the criminal conduct and the strong weight of the evidence.

### A.        Weight of the Evidence

In considering the danger and risk of flight presented by the defendant, the Court is required to consider the weight of the evidence against him. 18 U.S.C. § 3142(g)(2).

The evidence in this case is very strong. Several NYPD detectives heard rapid gunshots and almost immediately observed the defendant standing in the exact location of those sounds. Two officers reported seeing smoke emanating from where the defendant was standing and he was apprehended while in possession of a machinegun just moments later. At any trial, a jury will hear from multiple senior members of the NYPD who have extensive training in firearms and who can speak authoritatively about having heard automatic weapons fire coming from the location where they then observed the defendant standing. And the jury will hear from the experts at the ATF about the fact that the firearm was a machinegun and that the sounds the officers heard were consistent with the firing of a machinegun.

A jury will see the twelve cartridge cases—both the cases themselves and photographs depicting their location after the shooting—that came from the gun the defendant discharged. They will see the firearm itself, the empty magazine, and the machinegun conversion device. They will see powerful corroboration of the fact that the defendant committed a shooting in the photographs of the damaged vehicle and they will view surveillance video that shows a man in all black walking to and from the location of the shooting before and after it occurred. And of course, the jury will hear that the defendant was wearing the same clothing as the person officers saw standing where

they heard gunshots and that he had the seized machinegun on his person when he was arrested. The evidence in this case is incredibly strong.

### B.      Dangerousness

There is clear and convincing evidence that the defendant presents a danger to the community.  First, this was an incredibly serious offense.  The defendant is alleged to have opened fire with an automatic machinegun on a public street in the middle of the day.  To be sure, it is fortunate that no injuries have been reported, but the fact that the defendant would engage in such reckless and senseless violent conduct is in and of itself overwhelming evidence of the danger he poses.   The potential that his conduct could have resulted in serious death or injury was extraordinarily high.  Indeed, on November 25 of this year, a defendant in this district pleaded guilty to possession of a machinegun that caused the death of an innocent bystander when he fired multiple times on a public street in East Harlem.  *See United States v. Faisal McCants*, 25 Cr. 417 (JSR) (pleading guilty to possession of a machinegun that was discharged in connection with an armed robbery and that resulted in the death of Robin Wright, an innocent 69-year-old bystander).

And the fact that he is alleged to have committed this offense with an unserialized machinegun is even more concerning.  As the Court knows, firearms without serial numbers, or so-called "ghost guns" are incredibly difficult to trace.  People who engage in violent criminal behavior prefer these types of firearms for that very reason—they can use the firearms to commit acts of violence while significantly reducing the likelihood that law enforcement will ever be able to track the firearms to them.  And machineguns are an even more serious threat because a person can empty an entire magazine with a single pull of a machinegun trigger. A ghost gun equipped with a machinegun conversion device is essentially an extremely difficult to track killing machine. And that is the type of weapon the defendant had on him when he was apprehended in this case.

The serious nature and circumstances of this offense coupled with the defendant's criminal history establish by clear and convincing evidence that he remains a danger to the community. The defendant has been convicted of numerous felony offenses, including at least two prior convictions related to the illegal possession of weapons.  And the fact that the defendant's most recent conviction is from 2009 is no mitigator.  Indeed, since that time, the defendant—who is a 53-year-old-man—has been able to obtain a firearm, magazine, bullets, and machinegun conversion device. And he is alleged to have used those items in a shooting. If anything, the defendant's criminal conduct is escalating dangerously, and he poses a serious danger to the community.

### C.      Risk of Nonappearance

In addition to the defendant's significant danger to the community, he also poses a risk of nonappearance.  The crimes with which the defendant is charged carry significant potential penalties.  If convicted of both counts in the indictment, the defendant faces a maximum sentence of 25 years' imprisonment—more than eight times any sentence the defendant has previously received.  *See* 18 U.S.C. § 3142(g)(1).  The possibility of a substantial sentence is a significant factor in assessing the defendant's risk of nonappearance. *See United States v. Green*, No. 20 Cr. 357 (VM), 2020 WL 5814191, at *2 (S.D.N.Y. Sept. 30, 2020) (noting that substantial sentence defendant may face weighed in favor of finding that defendant was a flight risk); *see also United States v. Moscaritolo*, No. 10 Cr. 4 (JL), 2010 WL 309679, at *2 (D.N.H. Jan 26, 2010) ("[T]he

steeper the potential sentence, the more probable the flight risk is, especially considering the strong case of the government . . .") (citation omitted).  Here, the defendant faces as much as 25 years' imprisonment if he is convicted.  Moreover, the incentive to flee or not appear in court is especially strong here because of the strength of the evidence in this case, including the seizure of the machinegun from the defendant's person.  The defendant's age is also a relevant factor here.  At 53 years old, a substantial incraceratory sentence could mean that the defendant will spend the majority of the rest of his life in prison.  That is an incredibly strong incentive to not appear for further court proceedings.

The defendant's history also corroborates the Government's concern that he poses a risk of non-appearance.  As discussed above, the defendant's parole was revoked in the state because he was convicted of another felony offense that occurred while he was on parole.  And at least one court has previously issued a warrant because he failed to appear.

As set forth above, the defendant poses an ongoing and significant danger to the community and present a serious risk of nonappearance.  The Government respectfully submits that there are no conditions of bail that would assure the appearance and compliance of the defendant, or the safety of others.  Accordingly, any application for bail should be denied and the defendant should be detained pending trial.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:  ___/s/Brandon D. Harper_____
Brandon D. Harper
Assistant United States Attorney
(212) 637-2209